IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, for the use and benefit of KRANE DEVELOPMENT, INC., d/b/a ADS SERVICES, INC., | * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | CV 121-035 |
| GILBANE FEDERAL COMPANY; TRAVELERS CASUALTY & SURETY COMPANY; and OHC ENVIRONMENTAL ENGINEERING, INC., | * * * * * | |
| Defendants. | * | |

O R D E R

Presently pending before the Court is Defendant Gilbane Federal Company ("Gilbane") and Defendant Travelers Casualty & Surety Company's ("Travelers") (collectively, "Moving Defendants") motion for judgment on the pleadings as to Count I of Plaintiff United States of America, for the use and benefit of Krane Development, Inc., d/b/a ADS Services, Inc.'s ("ADS") Second Amended Complaint. (Doc. 103.) For the following reasons, Moving Defendants' motion is **GRANTED**.

I. BACKGROUND

This case arises out of various contracts through which Gilbane contracted with the Army Corps of Engineers ("COE") for

two renovation projects at Fort Gordon, Georgia — Allen Hall ("Allen Hall Project") and Moran Hall ("Moran Hall Project") (collectively, the "Projects"). (Doc. 57, at 2.) Gilbane entered into two contracts with OHC Environmental Engineering, Inc. ("OHC") for demolition and asbestos abatement work on the Projects. (Id.) OHC, in turn, entered into two contracts with ADS to perform a portion of OHC's contract work with Gilbane (Id.)

Gilbane obtained performance and payment bonds through Travelers ("Travelers Bonds") in favor of the COE to satisfy its Miller Act requirements for the Allen Hall Project. (Id.) As part of the Gilbane-OHC Contracts[1] for the Projects, OHC was required to provide performance and payment bonds, which OHC secured through its sub-subcontractor, ADS ("Axis Bonds"). (Doc. 59, at 13-14.) On the Axis Bonds, Axis Insurance Company ("Axis") is the surety, ADS is the principal, and OHC and Gilbane are listed as dual obligees. (Id. at 14.)

ADS began working on the Allen Hall Project pursuant to the OHC-ADS Contract in March 2019. (Doc. 57, at 5.) In April 2019, Gilbane requested OHC, and, in turn, ADS, perform work that was outside the scope of the Gilbane-OHC Contract. (Id. at 3.) ADS performed this additional work and submitted change order requests

---

[1] The Court refers to the contract between Gilbane and OHC for the Allen Hall Project as the "Gilbane-OHC Contract" and the contract between OHC and ADS for the Allen Hall Project as the "OHC-ADS Contract." Occasionally, the Court refers to the "Gilbane-OHC Contracts" and the "OHC-ADS Contracts," which refers to the contracts for both Projects.

2

in an amount over $500,000. (Id.) ADS "negotiat[ed] with Gilbane during the summer of 2019, [and] agreed to take a lesser sum than it submitted if it would be paid promptly for its work." (Id.) However, ADS was not paid, so on September 19, 2019, it sent a "Notice of Non-Payment" to Gilbane[2] for the full amount due under the OHC-ADS Contract, "including two payment applications not paid and its change order requests." (Id.) ADS was still not paid, so it inquired of Gilbane as to why it had not been paid, and ADS learned that Gilbane paid OHC pursuant to the Gilbane-OHC Contract, and OHC had not in turn paid ADS. (Id. at 4.).

On September 30, 2019, ADS received a letter from the president of OHC stating Gilbane banned ADS from the work site and ADS's workers would not be permitted on the site to complete the remaining work in the OHC-ADS subcontract. (Id.) Notwithstanding its banishment from the site, ADS agreed to complete the remaining work on the Allen Hall Project through subcontractors on ADS's behalf. (Id.)

ADS still had not been paid for its work, so on March 30, 2020, ADS sent a second "Notice of Non-Payment" to Gilbane and Travelers for the outstanding balance. (Id. at 5.) After ADS submitted the second "Notice of Non-Payment," Gilbane, through

---

[2] ADS represents that it sent the September 19, 2019 "Notice of Non-Payment" to Gilbane and Travelers, however, the copy of the notice reveals it was sent to Gilbane and OHC. (Doc. 57, at 3; Doc. 57-2, at 2.) This discrepancy does not affect the Court's analysis as the statute does not require notice be sent to the surety. See 40 U.S.C. § 3133(b)(2).

3

OHC, requested additional information from ADS regarding the change order pricing, which ADS submitted. (Id.) Through OHC, Gilbane set up a meeting with ADS on June 3, 2020, in Jacksonville, Florida, where Gilbane requested ADS submit additional information to support its change order pricing. (Id.) Gilbane also requested ADS perform additional work that was not in the OHC-ADS Contract, but ADS told Gilbane it would not perform any additional work outside of the OHC-ADS Contract until it was paid for the change order work. (Id.)

ADS completed its remaining work on the Allen Hall Project pursuant to the OHC-ADS Contract on June 19, 2020. (Id.) In October 2020, ADS filed a Freedom of Information Act request with the COE to determine whether the COE paid Gilbane. (Id. at 6.) In January 2021, ADS learned that the COE paid Gilbane in full for ADS's change order request on July 2, 2020, and ADS subsequently learned that Gilbane paid OHC in accordance with the terms of the Gilbane-OHC Contract, but OHC never paid ADS because of alleged "failure to perform." (Id.)

On October 22, 2021, ADS filed its Second Amended Complaint, asserting claims for payment under the Miller Act against Moving Defendants, a claim of unjust enrichment against Moving Defendants, and a claim of breach of contract against OHC. (See Doc. 57, at 7-10.) On November 5, 2021, Gilbane filed its answer, affirmative defenses, crossclaim, and Third-Party Complaint.

4

(Doc. 59.)  On August 12, 2022, Moving Defendants filed this pending motion for judgment on the pleadings as to Count I of the Second Amended Complaint, a claim for payment under the Miller Act for the Allen Hall Project. (Doc. 103.)  ADS responded in opposition (Doc. 107) and Moving Defendants replied in support (Doc. 113).  As such, the motion is now ripe for consideration.

## II. LEGAL STANDARD

"After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).  "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts."  Cunningham v. Dist. Att'y's Off. for Escambia Cnty., 592 F.3d 1237, 1255 (11th Cir. 2010) (citation omitted).  "The legal standards applicable to Federal Rule of Civil Procedure 12(c) motions for judgment on the pleadings and Rule 12(b)(6) motions to dismiss are the same."  Marshall v. Safeco Ins. Co. of Ind., No. CV 112-113, 2013 WL 12155468, at *1 (S.D. Ga. Apr. 16, 2013) (citing Roma Outdoor Creations, Inc. v. City of Cumming, 558 F. Supp. 2d 1283, 1284 (N.D. Ga. 2008)).

Therefore, when considering a motion for judgment on the pleadings, the Court must "accept as true all material facts alleged in the non-moving party's pleading[] and . . . view those

facts in the light most favorable to the non-moving party." <u>Perez v. Wells Fargo N.A.</u>, 774 F.3d 1329, 1335 (11th Cir. 2014).

> Moreover, while notice pleading may not require that the pleader allege a specific fact to cover every element or allege with precision each element of a claim, it is still necessary that a complaint contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.

<u>Fin. Sec. Assurance, Inc. v. Stephens, Inc.</u>, 500 F.3d 1276, 1282-83 (11th Cir. 2007) (quoting <u>Roe v. Aware Woman Ctr. for Choice, Inc.</u>, 253 F.3d 678, 683 (11th Cir. 2001)) (internal quotations omitted).

In this case, ADS asserts a claim under the Miller Act, 40 U.S.C. § 3131 *et seq.*, against Moving Defendants. The Miller Act provides,

> [a] person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made.

40 U.S.C. § 3133(b)(2). "Failure to comply with the ninety day notice requirement will bar a claim on the payment bond." <u>U.S. for Use of Bros. Builders Supply Co. v. Old World Artisans, Inc.</u>, 702 F. Supp. 1561, 1565 (N.D. Ga. 1988) (citing <u>U.S. for Use of Ga. Elec. Supply Co. v. U.S. Fidelity & Guaranty Co.</u>, 656 F.2d 993, 995 (5th Cir. Unit B 1981)).

6

## III. DISCUSSION

Moving Defendants argue they are entitled to judgment on the pleadings because "ADS failed to timely provide notice to Gilbane within the period mandated by the Miller Act." (Doc. 103, at 2.) In response, ADS argues it was not required to provide Gilbane notice before filing suit because it is in a direct contractual relationship with Gilbane through the Axis Bonds, and, regardless, it provided Gilbane notice in accordance with the Miller Act. (Doc. 107, at 3-5, 6-9.) The Court first addresses whether ADS was required to provide Gilbane notice under the Miller Act, and then addresses the timeliness of ADS's notices.

**A. ADS Was Required to Provide Notice to Gilbane**

The Miller Act provides that "[a] person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days . . . " 40 U.S.C. § 3133(b)(2). Moving Defendants argue the notice requirement "undisputedly applies to ADS" because ADS has a direct contractual relationship with the subcontractor, OHC, and no contractual relationship with the prime contractor, Gilbane. (Doc. 103, at 4.) ADS, however, argues that it is in a "direct contractual relationship" with Gilbane because ADS is listed as the principal on the Axis Bonds and Gilbane is an obligee. (Doc.

7

107, at 3-5.) ADS argues this contractual relationship "is established by the suretyship relationship and Gilbane's own allegations." (Id. at 4-5.) However, the Axis Bonds do not establish a contractual relationship between ADS and Gilbane.

ADS argues it is in a contractual relationship with Gilbane that obviates the need for notice because ADS is listed as the principal on the Axis Bonds and Gilbane is a co-obligee.[3] (Id. at 2.) As a preliminary matter, the Court notes that the Axis Bonds resulted from a requirement in the Gilbane-OHC Contracts, which required OHC "provide Performance and Payment Bonds each in the amount of one hundred percent (100%) of the Agreement Price." (Doc. 59-1, at 25; Doc. 59-2, at 25.) OHC secured these bonds through ADS, and Gilbane was only later added as an obligee to the Axis Bonds at the request of OHC, and not because there was any type of contract between Gilbane and ADS. (See Doc. 113, at 9-10.)

Nevertheless, ADS argues the Axis Bonds create a contractual relationship because "suretyship is a contractual relationship under which the surety engages to be answerable for the debt or default of its principal; 'the terms of the contract of which the

---

[3] In opposition to Moving Defendants' motion, ADS cites various places in the pleadings that allegedly show this contractual relationship between it and Gilbane. (See Doc. 107, at 4.) However, despite ADS's position in its response, ADS refers to itself in the Second Amended Complaint as a "sub-subcontractor" to Gilbane, who contracted with Gilbane's subcontractor, OHC,. (See Doc. 57, at 2-3.)

8

surety promises performance must be read into his own contract [and] [t]he principal's contract and the bond or undertaking of the surety are to be construed together as one instrument.'" (Doc. 107, at 5. (citation omitted).) In support of its argument, ADS relies on this Court's June 8, 2022, Order, where the Court found "the parties to the bond are: ADS, as contractor and principal; OHC, as owner; and Axis, as surety . . . [p]ursuant to the Rider, OHC is the obligee on the bonds and Gilbane is a dual obligee." (Id. (quoting Doc. 97, at 9).)

Here, the Axis Bonds do not establish a contract between ADS and Gilbane such that notice is not required. As the Court's June 8, 2022 Order stated, the parties to the Axis Bonds are ADS, OHC, and Axis. (Doc. 97, at 9.) Gilbane is not a party to the Axis Bonds; rather, Gilbane is an obligee. (Id.) The obligations that arise out of the Axis Bonds are between ADS as principal and Axis as surety; Gilbane, as an obligee, is only a beneficiary of the agreement between Axis and ADS. See Nat'l Fire Ins. Co. of Hartford v. Fortune Const. Co., 320 F.3d 1260, 1278 (11th Cir. 2003) (finding that normally, in a bond agreement, "[t]he obligee is a beneficiary of the agreement between surety and principal"); A.J. Kellos Constr. Co. v. Balboa Ins. Co., 495 F. Supp. 408, 412 (S.D. Ga. 1980) ("The surety in a performance bond guarantees that the principal will perform the contract, and if the principal defaults, the surety shall pay damages in the amount of the

bond."). Thus, no contractual relationship between ADS and Gilbane is established based on the Axis Bonds.

Moreover, ADS argues a contract between it and Gilbane arises because "[t]he terms of the contract of which the surety promises performance must be read into his own contract. The principal's contract and the bond or undertaking of the surety are to be construed together as one instrument." (Doc. 107, at 5 (citation omitted).) Here, the contract of which Axis promises performance is the OHC-ADS Contract, to which Gilbane is not a party. (See Doc. 59-4, at 5, 9.) Thus, there is no contractual relationship between ADS and Gilbane that would obviate the need for notice. Therefore, ADS was required to provide Gilbane notice before bringing suit. The Court now evaluates the timeliness of the notices ADS sent Gilbane.

## B. ADS's Notices Were Untimely

The Miller Act requires "written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made." 40 U.S.C. § 3133(b)(2). Moving Defendants argue that ADS's notices were premature because they were sent prior to the date on which ADS completed its work on the Allen Hall Project. (Doc. 103, at 5-7.) In opposition, ADS argues it was entitled to provide notice prior to the completion of its work, or alternatively, that Moving Defendants

10

misconstrue the date on which the ninety-day clock begins to run. (Doc. 107, at 6-9.)

ADS sent the first Notice of Nonpayment on September 19, 2019, and the second Notice of Nonpayment on March 30, 2020. (Doc. 57, at 3, 5; Doc. 57-2, Doc. 57-4.) ADS completed work on the Allen Hall Project on June 19, 2020. (Doc. 57, at 5.)

In the Eleventh Circuit, notice provided by a subcontractor or supplier prior to the final completion of the claimant's work is premature, and therefore untimely, under 40 U.S.C. § 3133(B)(2). See Nat'l Union Indem. Co. v. R.O. Davis, Inc., 393 F.2d 897, 900 (5th Cir. 1968)[4] (finding that notice sent by a supplier to the prime contractor was premature if sent prior to the final delivery of the materials); U.S. for Use & Benefit of Kinlau Sheet Metal Works, Inc. v. Great Am. Ins. Co., 537 F.2d 222, 224 (5th Cir. 1976) (holding a letter was premature and therefore could not be considered as notice when it was delivered before the completion of the claimant's work on the project.)[5]  Here, both of ADS's notices were sent prior to the final completion of its work on the

---

[4] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in the Eleventh Circuit).

[5] ADS attempts to distinguish these cases from the one at hand by differentiating between a supplier and a sub-subcontractor; however, the notice provision does not distinguish between suppliers and sub-subcontractors. (See Doc. 107, at 6.)  Rather, 40 U.S.C. § 3133(b)(2) requires notice be given "within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made" regardless of their position as a supplier or sub-subcontractor.

11

Allen Hall Project; therefore, the notices were premature and untimely pursuant to the Miller Act. As such, Moving Defendants' motion for judgment on the pleadings on Count I (Doc. 103) is **GRANTED**.

## C. Jurisdiction

ADS's only remaining claims are state law claims. (See Doc. 57.) As such, this action implicates 28 U.S.C. § 1367, which provides "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). The Court addresses each factor below.

As for judicial economy, this case was filed over three years ago, and the docket contains over one hundred entries. However, the Eleventh Circuit has found that "[i]f we hold that considerations of judicial economy favor retaining jurisdiction, we would provide litigants with perverse incentives to sandbag their own cases in the hope that courts spend enough resources to

12

make decisions to exercise supplement jurisdiction effectively unreviewable." Ameritox, Ltd. v. Millennium Lab'ys, Inc., 803 F.3d 518, 538-39 (11th Cir. 2015) (citation omitted). Here, the judicial resources expended by this Court are not such that the Court must retain jurisdiction. See e.g., id. at 537 (declining to exercise supplemental jurisdiction over state law claims where two separate district courts were involved in the dispute, with one district court investing over three years in the case, the docket contained over seven-hundred entries, and there was a ten-day jury trial).

As for fairness, while discovery in this case ended in December 2022, the Parties stand to benefit from already completing discovery as "[b]oth parties are free to use evidence obtained during discovery to pursue their state-law claims in a proper forum." Id. at 539 (citation omitted). Moreover, "every litigant who brings supplemental claims in court knowingly risks the dismissal of those claims." Id. (citation omitted).

Comity supports dismissal, as "[s]tate courts, not federal courts, should be the final arbiters of state law." Id. at 540 (quoting Baggett v. First Nat. Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997)). The Eleventh Circuit "encourage[s] district courts to dismiss any remaining state claims, when, as here, the federal claims have been dismissed prior to trial."

Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (citation omitted).

As for convenience, there is no indication that it is more convenient for the parties to litigate in federal court as opposed to state court. Additionally, a dismissal of the state law claims would not raise a statute-of-limitations problem as "[t]he period of limitations for any [state] claim [joined with a claim within federal-court competence] shall be tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." Artis v. District of Columbia, 138 S.Ct. 594, 598 (2018) (quoting 28 U.S.C. § 1367(d)). Therefore, in its discretion, the Court determines that because no federal claim remains, ADS's state law claims are better left for the state courts to resolve. As such, the court declines to retain jurisdiction and consider those claims.

## IV. CONCLUSION

Upon due consideration, the Court **GRANTS** Moving Defendants' Motion for Judgment on the Pleadings (Doc. 103). Count I of ADS's Second Amended Complaint (Doc. 57) is **DISMISSED**. Because the Court declines to exercise jurisdiction over ADS's remaining state law claims, Counts II and III of ADS's Second Amended Complaint (Doc.

57) are **DISMISSED WITHOUT PREJUDICE**. The **CLERK** is **DIRECTED** to terminate all pending motions and deadlines and close this case.

**ORDER ENTERED** at Augusta, Georgia, this 23rd day of March, 2023.

```
_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
```